UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
THOMAS BUTTARO,

15-cv-_____

                              Plaintiff,

          -against-                                              COMPLAINT
                                                                 Demand for Jury
                                                                 Trial

THE CITY OF NEW YORK, DANIEL A. NIGRO,
Individually and in his capacity as Commissioner of
The New York City Fire Department, PAUL
WASHINGTON, individually and in his official capacity
as Captain in the New York City Fire Department; and
SHAWN L. THOMAS, individually in his official capacity
as a Firefighter and as a Lieutenant in the New York City
Fire Department,

                              Defendants.
-----------------------------------------------------------------------X

     Plaintiff, Thomas Buttaro, by and through his attorneys, alleges the

following upon information and belief against the Defendants as his Complaint:

                         NATURE OF THE ACTION

     1.     Plaintiff brings this civil rights action to vindicate rights guaranteed to

him by the United States Constitution and federal civil rights statutes.  Those rights

include: (a) the freedom of speech and expression as protected by the First

Amendment; (b) the right to be free from selective prosecution and selective

treatment for exercising his right to speak as protected by the Equal Protection

Clause of the Fourteenth Amendment; and (c) the right to be free from

discrimination because of the color of his skin as protected by the Equal Protection

Clause of the Fourteenth Amendment and Federal Civil Rights statutes, including

42 U.S.C. § 1981 & § 1983.

BACKGROUND

2.      After 16 years of loyal and diligent service as a Firefighter working

for the New York City Fire Department, on February 10, 2015, Fire Commissioner

Daniel A. Nigro terminated Buttaro because he wore t-shirts that bore expressions

referring to an wide-spread public debate in the City of New York and in the Fire

Department about whether the standards for the employment test to become a

Firefighter should be lowered to address a long-standing statistical disparity

between the percentage of black Firefighters in the Fire Department and the

percentage of blacks living in the New York City metropolitan area.

3.      Buttaro wore two t-shirts: one bore a breast-pocket logo similar to that

of the FDNY with the words "Merit Matters" inside the logo.  On the back of this

t-shirt was printed the FDNY's official equal opportunity policy statement:   "The

Fire Department is firmly committed to maintaining fair employment practices for

its employees and applicants and ensuring that employment decisions are made

without regard to …color…gender…race…religion…."  The second t-shirt worn

by Buttaro similarly bore a breast-pocket FDNY logo, below which was printed

"Minorities Against Dumbing Down the Fire Department."  The back of the

second t-shirt had the FDNY uniform patch logo with the words above and below, "Getting This The Old Fashioned Way—Earning It!"

4.      The Fire Department Commissioner terminated Buttaro as part of, and in furtherance of, a Fire Department policy established and implemented by Commissioner Nigro and his predecessor, Commissioner Salvatore J. Cassano, to eliminate dissent within the rank and file of the Fire Department about racial quotas and diluted employment standards.

5.      In furtherance of that policy, the Fire Department also conducted raids on firehouses for the purpose of removing literature with opposing or different points of view, which had been posted on bulletin boards in firehouses or otherwise made available for review and distribution to Firefighters.

6.      In furtherance of that policy, the Fire Department also waged a targeted campaign to silence Merit Matters, an informal organization of Fire Department employees who opposed what they considered imposition of racial and other quotas in hiring that would diminish job standards.   The Fire Department's campaign resulted in disciplinary action against the leader of Merit Matters, Deputy Chief Paul Mannix.  The Department forced Mannix, through threat of termination as it had recently done to Buttaro, to disband Merit Matters and shut down its Web site.  Mannix capitulated under the Fire Department threats and publicly humiliated himself by disavowing the cause that Merit Matters fought for

and Buttaro lost his job for.

7.     There was no legitimate employment justification for terminating Buttaro.  Buttaro wore the t-shirts under his uniform while on duty or openly in the firehouse while off duty as a silent and respectful expression of his support for the position taken by the City of New York and others in on-going and well-publicized litigation in this Courthouse.  That litigation (hereinafter referred to as the "District Court Discrimination Action") was commenced by the United States Department of Justice and the Vulcan Society, a fraternal organization of African-American and Caribbean members of the Fire Department to challenge the Fire Department's employment testing standards on the grounds that the existing Firefighter tests had a disparate impact on minority candidates and that the tests were not sufficiently related to the essential job functions of a Firefighter.   In the District Court Discrimination Action, the Vulcan Society and the Department of Justice sought racial diversity in the Fire Department though remedial and injunctive relief,.

8.     Buttaro's expressive conduct against what he perceived was lowering the employment standards did not cause any disruption in Fire Department operations and did not create any genuine threat that his conduct might cause any disruption in Fire Department operations.  And to the extent that Buttaro's speech did create any possibility of a vigorous or robust response, the First Amendment's free speech clause mandates that competing views be provided the "breathing

room" for the open debate that a democracy requires. Above all, the free speech clause prohibits any governmental official or agency from taking sides in the debate.

9. Despite these fundamental tenets of constitutional law, Buttaro was terminated purportedly because the t-shirts allegedly offended a black Firefighter, Shawn Thomas, who was also a member of the Vulcan Society and a fellow firefighter working with Buttaro at the same firehouse. Although Thomas knew for at least one year prior that Buttaro was wearing the t-shirts openly in the firehouse, Thomas did not pursue his "objections" against Buttaro until shortly after Buttaro spoke out publically at a hearing in this Courthouse about the subject of a remedial order being considered in the District Court Discrimination Action. Thomas and his supervisor Captain Paul Washington -- both members of the Vulcan Society -- brought bogus charges against Buttaro claiming that his wearing the Merit Matters t-shirts created a "hostile work environment" for Thomas and violated an "order" by Washington not to wear the t-shirts.

10. Thomas's and Washington's trumped-up charges of a "hostile work environment" were in retaliation against Buttaro for attending the Fairness Hearing and speaking against the remedial order.

11. Thomas's and Washington's trumped-up charges of a "hostile work environment" served as a convenient pretext for the Fire Department in its

campaign against dissent.  Buttaro's termination sent a loud and clear message to the 10,000 Firefighters in the Fire Department that outspoken dissent from the party line will be met with the harshest of penalties – the loss of one's livelihood.

12.    Buttaro commences this action to address these flagrant violations of core constitutional and civil rights, to demand that he be reinstated to his position as a New York City Firefighter with fair and full compensation for that which he lost as a result of his unlawful termination and as a result of the bogus charges asserted against him.

## JURISDICTION AND VENUE

13.    The jurisdiction of this Court is invoked pursuant to 28 U. S. C. §§ 1331, 1343 & 1367(a) for claims arising under federal law and for claims arising under the state and local law based on a common nucleus of operative facts as to make exercise of supplemental jurisdiction appropriate.

14.    Venue is proper in the United States District Court for the Eastern District of New York pursuant to 28 U. S. C. §§ 1391 (b) and (c).

## PARTIES

15.    Plaintiff, Thomas Buttaro ("Buttaro"), is a former employee of the New York City Fire Department who at all times relevant to the Complaint held the position of Firefighter.

16.    Defendant, the City of New York ("City"), is a municipal corporation

duly organized and existing under the laws of the State of New York.  The City is a "person" for purposes of enforcement of the rights guaranteed under 42 U. S. C. § 1983.  The City is authorized under the laws of the State of New York to maintain the New York City Fire Department ("FDNY" or the "Fire Department"), which is a department, agency, bureau and/or subdivision of the City.

17.     The Fire Department employs over 10,000 individuals who hold the title of Firefighter and work as such throughout the City of New York.

18.     Defendant, Daniel A. Nigro ("Nigro"), is employed by the City as the Commissioner of the Fire Department.

19.     Defendant, Paul Washington ("Washington"), a black male, is employed by the City of New York as a Captain in the Fire Department.

20.     Defendant, Shawn L. Thomas ("Thomas"), a black male, is employed by the City of New York as a Lieutenant in the Fire Department, and at most of the times relevant to this Complaint, held the position of Firefighter.

BACKGROUND FACTS

21.     Buttaro, who is a white male, joined the Fire Department in 1998 as a Firefighter.

22.     In 2003, Buttaro was transferred to the firehouse containing Engine 234/Ladder 123, which is located in and operated out of a firehouse in Crown Heights, Brooklyn.

23.     An "Engine" assignment requires that a Firefighter work with a crew of other Firefighters by responding to the scene of a fire in a Fire Department Engine, securing the vehicle to a water source, and extinguishing the fire.  A "Ladder" assignment requires a crew to respond to the scene of a fire in a Fire Department Truck with an attached fire ladder to conduct search and rescue operations, forcibly enter the burning premise, and ventilate the structure when necessary.

24.     Buttaro remained assigned to Engine 234/Ladder 123 for the next 12 years from 2003 until Nigro terminated him on February 10, 2015.

25.     At all relevant times, Buttaro ably and satisfactorily performed his duties.

26.     From 1998 until the events leading to his termination, Buttaro was an exemplary employee and never received any kind of discipline from the Fire Department.

27.     In December of 2005, Thomas transferred to the Crown Heights firehouse containing Engine 234/Ladder123, was assigned to Engine 234, and remained at that firehouse for the next eight years until he was promoted to Lieutenant on July 25, 2013.

28.     From December 2005 through July 2013, Buttaro and Thomas worked at the same firehouse, and throughout that period of time regularly worked

together.

29.     There were no occasions during the eight-year period when Thomas and Buttaro were not able to work together and perform their duties as Firefighters, and there was no disruption or diminution of the performance of any of the Firefighters or the operation of the Engine Company as a result of Buttaro's t-shirts.

## THE FDNY DISCRIMINATION ACTION

30.     In July 2009, the District Court for the Eastern District of New York, which is located in downtown Brooklyn, ruled that the City's use of two firefighter exams administered by the Fire Department constituted disparate impact discrimination against black and Latino firefighter candidates in violation of race discrimination laws under Title VII. *United States v. City of New York*, 637 F.Supp.2d 77 (E.D.N.Y. 2009), *affd in part and rev'd in part*, 717 F. 3d 72 (2d Cir. 2013).   The District Court also held that the Fire Department had engaged in intentional race discrimination as a matter of law, a determination vacated on appeal. *Id.*

31.     To effectuate this ruling, in January 2010, the District Court ordered the Fire Department to develop a new Firefighter exam and provide monetary and other forms of compensatory relief to those minority candidates who were either denied appointment or whose appointments were delayed because of the City's use

of the discriminatory Firefighter examinations. *United States v. City of New York*, 2010 U.S. Dist. LEXIS 4509 (E.D.N.Y. Jan 21, 2010).

32. The District Court's decisions on the issue of discrimination, racial quotas, and reverse discrimination magnified the public and media attention to these issues, which were matters of public concern and debate in the City and within the membership of the Fire Department.

33. In 2009 and 2010, several grass root organizations of officers and rank and file members of the Fire Department developed for the purpose of articulating and disseminating their political and social views about the importance of rigorous standards for becoming a Firefighter and about the need to address discrimination and reverse discrimination in the Fire Department.

34. Informal organizations of members of the Fire Department were wide-spread. At the times relevant to this Complaint, there were at least six fraternal organizations of members of the Fire Department, including the Emerald Society, which is an organization of individuals of Irish origin; the Vulcan Society, which is an organization of individuals of African-American or Caribbean origin; the Steuben Association, which is an organization of individuals of German origin; the Columbia Association, which is an organization of individuals of Italian origin; the Hispanic Society, which is an organization of individuals of Hispanic origin; and the Phoenix Society, which is an organization of individuals of Asian origin .

35.    One of the organizations that developed as a result of the District Court's rulings was Merit Matters.

36.    Merit Matters was an informal organization, headed by Paul Mannix, which consistent of active and retired members of the Fire Department from various diverse racial and ethnic origins, including white, black, and Latino members of the Fire Department. It also welcomed in its ranks men and woman and individuals from any religion or any political affiliation.

37.    At around this same time, t-shirts bearing the expression "Minorities Against Dumbing Down" ("MADD") also became popular, and upon information and belief, this t-shirt was created by one or more minority members of the Fire Department.

38.    From at least the middle of 2011 Buttaro began wearing Merit Matters or MADD t-shirts (collectively, the "t-shirts") at work openly while off duty in the firehouse, or while arriving or leaving for work.

39.    In addition, during that same period of time, Buttaro regularly wore while on duty either a standard FDNY t-shirt under his uniform or one of the Merit Matters or MADD t-shirts.  All these t-shirts are dark blue and none were visible under the uniform.

40.    During this period of time, when Buttaro wore a Merit Matters or MADD t-shirt as an undershirt underneath his uniform, he was never told that he

was "out of uniform".

41.     Nor was Buttaro ever told that he could not wear the t-shirts in the firehouse while off duty.

42.     Thomas first noticed that other Firefighters were wearing Merit Matters or MADD t-shirts by at least mid-2011, when the t-shirts became a popular item with members of the Fire Department.

43.     When Thomas first noticed the t-shirts, he did not object or even believe that either t-shirt was offensive.

44.     Later, Thomas learned that Merit Matters was an organization within the FDNY that opposed certain aspects of the District Court's remedial order requiring the lowering of passing scores on Firefighter examinations and that the MADD t-shirt stood for an idea that was contrary to the Vulcan Society's position in the District Court Discrimination Action.

45.     Only much later did Thomas claim that he has personal objections to the t-shirts and those objections were based not on the words or ideas expressed by the t-shirts but on the political and social positions taken by the organizations that sponsored the t-shirts.

46.     Upon information and belief, in about 2011, the Fire Department established a public policy and practice of stifling opposition within the ranks of the Fire Department to opposition to the District Court's remedial orders.

47.    On December 29, 2011, the Fire Department issued Department Order

No. 89, which sought to prohibit the expression of any opinion in firehouses.  The

Department Order states:

> " 'Bulletin boards in facilities shall be used only for official Department
> business or important information relating to approved Departmental
> organizations. In addition to applicable EEO restrictions, material presenting
> opinions or viewpoints is not permitted anywhere in quarters.  It does not
> matter whether such opinions or views concern Department matters or non-
> Department matters.  NO articles/materials may be posted form any
> publications, internet or other sources."

48.    Upon information and belief, Department Order No. 89 was issued for

the purpose of silencing the Merit Matters organization and its membership, which

was growing at the time, because the Fire Department objected to any dissenting

points of view being circulated among Firefighters about the administration of the

District Court's remedial order.

49.    Upon information and belief, members of the staff of the Fire

Department's Equal Employment Opportunity unit began conducting raids in

firehouses in the City of New York to remove Merit Matters literature or any other

literature that opposed the District Court's remedial order.

### THE EVENTS LEADING TO THE PRETEXTUAL
### CHARGES AGAINST BUTTARO

50.    On May 6, 2012, Thomas, Dan Dombrowsky, Chris McSorley, three

Firefighters in the Crown Heights firehouse, were in the kitchen discussing the

difficulty of getting an assignment to a special operations unit in the Fire

Department when Thomas stated that he (Thomas) could not get that assignment because the Fire Department "didn't want his kind of people" in the special operations unit.

51.     By making this statement, Thomas was suggesting that the Fire Department was discriminating against him because of his race, thereby intentionally instigating and provoking an argument about race.

52.     At the time, Thomas was on a Fire Department list for promotion to a Lieutenant's title, and all participants in the kitchen discussion knew that is was unlikely that anyone, including Thomas, would be transferred to the special operations unit with a potential promotion application pending.

53.     Buttaro, who was also in the kitchen at the time but not participating directly in the discussion, interjected that the special operations unit was not being "racist" and sarcastically said that Thomas was not getting the assignment because he was a "whinny c _ _ t."

54.     In response to this comment, Thomas told Buttaro for the very first time that he objected to the t-shirt that Buttaro was wearing, which happened to be a MADD t-shirt, and requested that Buttaro take off the t-shirt.

55.     Buttaro refused to take off the t-shirt but when a fire officer, Lieutenant Zuhkle, asked Buttaro to take the shirt off, Buttaro agreed to switch to a Merit Matters t-shirt.

56.     By May of 2012 it was common knowledge in the Fire Department that Merit Matters was a rank and file organization of Fire Department members opposed to race-based hiring quotas or the lowering of the standards required to become a Firefighter.

57.     The May 6th event did not disrupt operations in the firehouse and none of the individuals involved took any further steps regarding the event.

58.     About 10 days later, on May 16, 2012, a civilian who was considering joining the Fire Department came to the firehouse and during the course of discussions about the current entrance examination, Buttaro gave the civilian one of his Merit Matters t-shirts, which the civilian willingly and voluntarily put on while in the firehouse.

59.     When Thomas saw the civilian wearing the t-shirt in the firehouse, he told the civilian to take it off.

60.     Buttaro objected, saying that the civilian had a right to wear the t-shirt and that Thomas did not have the right to dictate the civilian's choice of clothing.

61.     The civilian complied with Thomas's demand and after lunch left the firehouse without incident.

62.     The May 16th event did not disrupt operations in the firehouse and none of the individuals involved took any further steps regarding the incident.

63.     On May 21, 2012, Buttaro and other Firefighters from the Crown

Heights firehouse attended a day-long training session at Fire Department Headquarters.

64. At the end of the day, those being trained were schedule to go a classroom for an EEO training session. At the EEO class, Buttaro intended to raise a question about whether a Firefighter had a right to object to the wearing of t-shirts.

65. Although Thomas was not scheduled to work that day, he appeared in the classroom with others who were scheduled to conduct the class and proceeded to goad Buttaro because he was appearing in the classroom as an EEO instructor.

66. Upon information and belief, Thomas made special arrangements with the EEO office to appear that day in Buttaro's training class for the purpose of goading Buttaro.

67. At the commencement of the class, one of the instructors asked the members attending the class if any of them had any questions or concerns. Buttaro responded by stating that he believed that Thomas should not be in the position of being an instructor in the class because Thomas had a conflict of interest.

68. As a result of Buttaro's statement, one of the instructors discussed the matter with Buttaro privately outside the classroom, and then the both returned to the classroom.

69. The May 21th event did not disrupt the training session or any other

Fire Department operations.

70.   However the following day, May 22, 2012, Thomas walked into the Fire Department's EEO office and orally made a complaint about the events earlier that month involving Buttaro.

71.   Upon information and belief, Thomas made the complaint to the EEO office because he was concerned that Buttaro was going to make a complaint against him because of his goading conduct and because Buttaro had raised an issue of a conflict of interest outside of the firehouse, where the vast majority of issues between Firefighters are resolved.

72.   In the days following the May 21, 2012 classroom event, Buttaro did not file any complaint with the Fire Department about the training event.

73.   Three days later, May 25, 2012, Thomas withdrew his EEO complaint against Buttaro.

74.   For the next three months, Buttaro and Thomas continued to work together in the Crown Heights firehouse without incident and Buttaro continued on occasion to wear the t-shirts under his uniform while on duty and openly while he was off duty.

75.   At some point during the summer of 2012, another Firefighter raised a question with Lieutenant Zuhkle, one of the superior officers at the Crown Heights firehouse, about when and under what circumstances non-Department t-shirts

17

could be worn in the firehouse.

76.     As a result, in August of 2012, Lieutenant Thomas Zuhkle contacted the Fire Department's EEO office and obtained clarification from an EEO attorney that it was permissible to wear a non-Department t-shirt, such as the Merit Matters or MADD t-shirts, in the firehouse while a Firefighter was off duty.

THE FAIRNESS HEARING

77.     During the course of the summer of 2012, the District Court scheduled a "Fairness Hearing" on the District Court's proposed remedial orders in the District Court Discrimination Action.

78.     Buttaro was one of numerous members of the Fire Department who requested permission to speak at the Fairness Hearing.

79.     Over the course of four days, from October 1, 2012 through October 4, 2012, numerous individuals made direct statements to the District Court about the litigation and the proposed remedial order.

80.     On October 1, 2012, Buttaro spoke at the Fairness Hearing, expressing his concerns and objections about the proposed remedial order.

81.     Upon information and belief, Thomas and Washington were both personally involved in the District Court Discrimination Action as members of the Vulcan Society, which was an intervening plaintiff in the Action, and they both knew that Buttaro was going to make a statement at the Fairness Hearing.

18

82.     One week after Buttaro spoke at the Fairness Hearing, on October 8, 2012, Thomas took a photograph of Buttaro wearing a MADD t-shirt while Buttaro was off duty in the firehouse.

83.     Later that same day, Washington reported to the Fire Department's EEO office that he received an EEO complaint from a firefighter within his command.

84.     Upon information and belief, the EEO complaint that Washington reported on October 8, 2012 was from Thomas and was based in part on the fact that earlier that day Thomas took a photograph of Buttaro wearing the t-shirt.

85.     Upon information and belief, Washington and Thomas discussed and planned for Thomas to take a photograph of Buttaro wearing the t-shirts for the purpose of providing a bogus claim that Buttaro was creating a hostile work environment.

86.     Upon information and belief, Washington, aided and abetted by Thomas, reported the October 8, 2012 complaint to EEO in retaliation for Buttaro's appearance and speech at the Fairness Hearing on October 1, 2012, which was attended by Washington.

87.     Four days after Washington made his report, on October 12, 2012, the Fire Department's EEO office issued to Buttaro a notice that he was being investigated for creating a hostile work environment.

88.    The notice stated that Buttaro was being investigated for creating a hostile work environment on four specific days in 2012:  May 6th, May 16th, September 9th and October 8th.

89.    Upon information and belief, the May 6th and May 16th dates refer to the above-referenced events in the firehouse; the September 9th date was an occasion when Buttaro was seen by Thomas wearing a Merit Matters or MADD t-shirt while off duty in the kitchen eating breakfast before going home; and the October 8th date refers to the occasion where Thomas had taken a photograph of Buttaro while off duty and on medical leave in the firehouse wearing either a Merit Matters or a MADD t-shirt.

90.    Upon information and belief, Thomas, aided and abetted by Washington, pressed his bogus complaint with the Fire Department's EEO office in retaliation for Buttaro's appearance and speech at the Fairness Hearing and not because of any genuine belief or concern that wearing either of the t-shirts created a hostile work environment.

91.    In fact, during the course of 2013, Thomas submitted a request to be transferred into Ladder 123, which was Buttaro's Ladder assignment, thereby increasing the frequency and intensity of their contact, and in May of 2013, Thomas's transfer request was granted.

92.    In furtherance of the Fire Department's policy and practice of

silencing dissent within the ranks of the Fire Department, the Fire Department used the October 8, 2012 EEO complaint by Washington and Thomas as a pretext to press formal charges against Buttaro.

93.     In May of 2013, Buttaro filed a charge with the Fire Department's EEO Office, asserting among other things that he was being retaliated against because of his involvement in Merit Matters and his expressive conduct about Fire Department employment standards, and the Fire Department purposefully failed to address or investigate this charge.

94.     Some time before August 2103, Buttaro was deemed by the Fire Department as a "member not in good standing" and based on that status was denied opportunities to continue to enhance his career, including the opportunity to join a desirable position within the Fire Department's mentor program.

95.     On September 19, 2013, about three months after Thomas was promoted to Lieutenant and transferred out of the Crown Heights firehouse, the Fire Department filed charges against Buttaro alleging that he was (1) creating a hostile work environment in violation of a June 14, 2012 Department Order; (2) failing to wear only Department-issued clothing in the firehouse in violation of a June 28, 2012 Department Order; (3) failing to comply with the June 14, 2012 and June 28, 2012 Department Orders; (4) failing to wear only Department-authorized clothing; (5) conduct bringing reproach or reflecting discredit on the Fire

Department; and (6) violating his oath of office.

96.    On January 13, 2015, an administrative law judge recommended that Buttaro be terminated for allegedly creating a hostile work environment and failing to abide by purported orders not to wear the t-shirts.

97.    On February 10, 2015, at least 18 months after Thomas and Buttaro had any contact and at least 27 months after the last of the events forming the basis of Thomas' claim of a hostile work environment, Nigro terminated Buttaro.

98.    Upon information and belief, Nigro terminated Buttaro because of his expressive conduct and to make an example out of Buttaro to further the Fire Department's policy and practice of silencing and stifling the expression of views not favored by the Fire Department administration.

99.    As a result of being terminated, Buttaro has suffered damages of lost pay, emotional and mental anguish, pain and suffering, public humiliation, lost benefits as a Firefighter, and lost opportunities for promotion as well as other benefits incident to being a member in good standing of the Fire Department.

100.   As a result of being terminated, the Fire Department violated Buttaro's rights under the United States Constitution and federal statutory law, and he is thereby entitled to reinstatement to this position as a Firefighter as well as monetary damages in an amount to be established at trial.

101.   The Defendants, jointly and severally, have violated Buttaro's rights

of free speech, expression and association secured by the First and Fourteenth Amendments to the Constitution.

102.    The Defendants, jointly and severally, have violated Buttaro's rights to the equal protection of the laws secured by the Fourteenth Amendments to the Constitution by selectively enforcing rules and regulations against him and by selectively terminating him for alleged violations of those rules under circumstances where similarly situated members of the Fire Department were not punished as severely as Buttaro.

103.    Upon information and belief, numerous other Firefighters has been found to have violated the same or similar rules, regulations or orders of the Fire Department but were not terminated.

104.    Defendants, the City of New York and Nigro, terminated Buttaro because of his expressive speech and conduct.

105.    Defendants, the City of New York and Nigro, did not have any legitimate justification for terminating Buttaro, and none of Buttaro's conduct that formed the basis for the termination decision created any actual disruption of Fire Department operations.

106.    For years prior to the 2012 events leading up to this action, the Fire Department did not strictly enforce uniform regulations, and Firefighters regularly wore t-shirts in the firehouse bearing political, social or other images and

messages.

107. Upon information and belief, Buttaro was the only Firefighter ever charged with, or terminated for, violating Fire Department regulations or orders governing the wearing of t-shirts.

108. None of Buttaro's conduct that formed the basis for Nigro's termination decision presented any reasonable likelihood of causing a substantial disruption of Fire Department operations.

109. Any genuine concerns by the Fire Department about potential disruptions could have been raised without resort to the extreme punishment of termination, and as such, any legitimate governmental interest was not exercised in the least restrictive means appropriate to the circumstances.

110. Defendants, the City of New York and Nigro, took adverse action against Buttaro because of the content of his expressive conduct and speech on matters of public concern, ideas that the Department and Nigro were seeking to suppress within the employees of the Fire Department.

111. Defendants Washington and Thomas, aided and abetted by each other, retaliated against Buttaro by filing and pressing bogus charges of hostile work environment against Buttaro because of his expressive conduct.

112. Defendants Washington and Thomas, aided and abetted by each other, retaliated against Buttaro because of his race.

113.   Defendants Washington and Thomas, aided and abetted by each other, retaliated against Buttaro because he spoke out at the Fairness Hearing in the District Court Discrimination Action.

114.   Defendants, the City of New York and Nigro, terminated Buttaro because they viewed him as a symbol of dissent within the Fire Department and because a decision to terminate Buttaro would intimidate, chill, and stifle dissent within the Fire Department.

115.   Defendants Nigro, Washington and Thomas are employees of the City of New York and their actions were taken under color of State and local law

116.   As a direct and proximate result of the City's and its agents' acts and omissions, Buttaro suffered mental anguish, pain and suffering, emotional distress and injury to his reputation.

### FIRST CAUSE OF ACTION
#### (First Amendment – Free Speech)

117.   Buttaro repeats and realleges all the foregoing allegations as if set forth herein at length.

118.   The Defendants, the City of New York and Nigro retaliated against Buttaro by terminating him because he engaged in expressive conduct protected by the First Amendment.

119.   The Defendants, Washington and Thomas, retaliated against Buttaro by filing and pressing charges against him because he engaged in expressive conduct

protected by the First Amendment.

120.   The Defendants, the City of New York, Nigro, Washington and Thomas, jointly and severally, infringed upon and violated Buttaro's rights protected under the First Amendment to the United States Constitution and their actions, jointly and severally, were intended to harm Buttaro, and to place a chilling effect upon the exercise of such rights by Buttaro and other persons as is their right, as provided by the U.S. Constitution.

121.   As such, each of the Defendants' conduct was in violation of Buttaro's right to freedom of speech as secured by the First and Fourteenth Amendments.

## SECOND CAUSE OF ACTION
(Equal Protection – Selective Prosecution and Termination)

122.    Buttaro repeats and realleges all the foregoing allegations as if set forth herein at length.

123.    The City of New York and Nigro selectively prosecuted Buttaro for violations of alleged regulations and orders pertaining to the wearing of non-Department t-shirts because of Buttaro's protected conduct and because of his race.

124.   Upon information and belief, other Firefighters who were similarly situated to Buttaro were not prosecuted by the Fire Department for similar alleged violations.

125.   The City of New York and Nigro selectively terminated Buttaro for

26

violations of alleged regulations and orders pertaining to the wearing of non-Department t-shirts because of Buttaro's protected conduct and because of his race.

126.   Upon information and belief, other Firefighters who were similarly situated to Buttaro were not terminated by the Fire Department for similar alleged violations.

127.   As a result, the City of New York and Nigro violated Buttaro's rights to the equal protection of the laws, as secured by the Fourteenth Amendment to the Constitution.

THIRD CAUSE OF ACTION
(Section 1981)

128.   Buttaro repeats and realleges all the foregoing allegations as if set forth herein at length.

129.    The Defendants, the City of New York, Nigro, Washington and Thomas, jointly and severally, intentionally discriminated and retaliated against Buttaro because of his race, in violated Buttaro's rights protected by 42 U. S. C. § 1981.

FOURTH CAUSE OF ACTION
(Conspiracy by Washington and Thomas)

130.    Buttaro repeats and realleges all the foregoing allegations as if set forth herein at length.

131.    Defendants Thomas and Washington conspired and acted in

27

concert to do whatever was necessary, lawful or not, to violate Buttaro's rights, in violation of 42 U. S. C. §§ 1983 and 1985(3).

132.   Throughout the period of the conspiracy, Defendants Washington and Thomas pursued their objectives with actual malice toward Buttaro, with utter and deliberate indifference to and disregard for his rights under the Constitution and laws of the United States for the purpose of depriving him of the equal protection of the laws, or of equal privileges and immunities under the laws.

### FIFTH CAUSE OF ACTION
(New York City Administrative Code –
Discrimination and Retaliation)

133.   Buttaro repeats and realleges all the foregoing allegations as if set forth herein at length.

134.   Defendants, the City of New York, Nigro, Washington and Thomas, discriminated against Buttaro and retaliated against him in regard to the terms, conditions and privileges of his employment because of his race and because of his protected conduct in violation of Section 8-107, et seq., of the Administrative Code of the City of New York.

135.   Defendants Washington and Thomas are also liable to Buttaro for damages as aiders and abettors pursuant to Section 8-107 (6) of the Administrative Code of the City of New York.

136.   Pursuant to 8-502(c) of the Administrative Code, Buttaro has, through

his counsel, previously delivered to the New York City Law Department and the New York City Commission on Human Rights a copy of this Complaint.

137.   By virtue of the Defendants' conduct, Buttaro is entitled to recover against each named defendants, jointly and severally, his costs and expenses, including all reasonable attorney's fees pursuant to Section 8-502 (g) of the Administrative Code of the City of New York.

## SEVENTH CAUSE OF ACTION
### (Municipal Liability)

138.   Buttaro repeats and realleges all the foregoing allegations as if set forth herein at length.

139.   Nigro, as the Commissioner of the Fire Department of the City of New York, acts as a matter of law and as a matter of fact as the final policy-maker for the City of New York in connection with the actions taken against Buttaro.

140.   In addition, the City of New York is liable to Buttaro for the actions taken against him as alleged in this Complaint because the actions taken against him were taken because of a policy and practice within the Fire Department to silence the views and speech of individuals who engaged in expressive conduct, such as the expressive conduct engaged in by Buttaro.

141.   The Fire Department's policy and practice caused Buttaro to suffer the damages alleged by him in this Complaint.

WHEREFORE, Buttaro demands the following relief jointly and severally

against all defendants:

(a)     A declaration that each and every one of the Defendants violated Buttaro's federal constitutional and statutory rights and his rights under State and local law;

(b)     Compensatory damages for lost wages, lost benefits and other advantages of employment, including without limitation the loss of valuable medical treatment by the Fire Department for a line-of-duty injury, emotional and reputational injuries suffered by Buttaro by reason of Defendant' unlawful and unjustified conduct, in an amount just and reasonable in conformity with the evidence at trial;

(c)     Punitive damages against Defendant Nigro, Washington and Thomas to the extent allowable by law;

(d)     Reasonable attorneys' fees pursuant to 42 U.S.C. §§ 1988; and

(e)     Costs and disbursements of this action; and

(f)     Such further relief as appears just and proper.

Dated: New York, New York
         October 1 2015


                                        By:     *s/NBS*
                                        _____
                                        Nathaniel B. Smith
                                        100 Wall Street, 23rd Floor
                                        New York, New York 10005
                                        (212) 227-7062

natbsmith@gmail.com


John D. Lenoir
100 Wall Street, 23rd Floor
New York, New York 10005
(212) 335-0250
john.lenoir@gmail.com