UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------x
THOMAS BUTTARO,

               Plaintiff,                      MEMORANDUM AND ORDER
                                                      15 CV 5703 (ILG)

    -against-

CITY OF NEW YORK, et al.,

               Defendants.
-----------------------------------------------------x
GLASSER, United States District Judge:

Plaintiff Thomas Buttaro brings suit under 42 U.S.C. §§ 1981, 1983, 1985 and the New York City Human Rights Law (NYCHRL) against the City of New York and three members of the New York City Fire Department ("FDNY" or "Fire Department")—Commissioner Daniel Nigro, Captain Paul Washington, and Lieutenant Shawn Thomas—alleging First Amendment retaliation, selective treatment, discrimination, conspiracy, and municipal liability. Defendants have moved to dismiss the Complaint under Rules 12(b)(1) and 12(b)(6). For the reasons given below, the motion to dismiss is GRANTED in part and DENIED in part.

## 1. Background[*]

This case arose in the wake of an employment discrimination lawsuit brought in 2007 by the Department of Justice (DOJ) challenging the FDNY's hiring practices ("DOJ lawsuit"). As a result of the DOJ lawsuit, a district court held in 2009 that the FDNY's use of two entry-level exams to screen firefighter applicants had a disparate impact on African-Americans and

---

[*] The facts are drawn from the Complaint, DE 1, and the findings of an administrative law judge (ALJ) in the Office of Trials and Hearings (OATH). *See* ALJ Report and Recommendation, Def. Ex. B, DE 14-2 ("ALJ Op."). As discussed below, the ALJ's factfinding is entitled to preclusive effect. Thus, where the Complaint's allegations and ALJ's factual findings are inconsistent, the ALJ's findings control.

Hispanics in violation of Title VII.[1] Thus, in 2012, the district court ordered the FDNY to, among other things, implement a priority-hiring program for certain African-American and Hispanic applicants ("priority hiring").[2] *See* Compl. ¶¶ 30–31.

The DOJ lawsuit was controversial within the Fire Department. The case originated in 2002 when a group of minority firefighters, the Vulcan Society (led by Defendant Washington, the commanding officer of a firehouse in Crown Heights), complained about the FDNY's hiring practices to the Equal Opportunity Employment Commission. *See* ALJ Op. at 2. The ensuing investigation led to the DOJ lawsuit, in which the Vulcan Society intervened as plaintiffs. *Id.* at 3; Compl. ¶¶ 7, 44. After the district court's liability rulings in 2009 and 2010, informal groups of firefighters formed to oppose the court's rulings and "race-based hiring," and to highlight "the importance of rigorous standards for becoming a Firefighter and about the need to address discrimination and reverse discrimination." Compl., ¶¶ 32–33. These groups were called "Merit Matters" and "Minorities against Dumbing Down the Department (MADD)." *Id.* ¶¶ 35–37, 56.

The Vulcan Society's involvement in the DOJ lawsuit and Merit Matters' opposition caused discord within the Fire Department. *See* ALJ Op. at 4 ("by 2012, 'lines had been drawn' within the Department"); *id.* at 6 (while "black firefighters felt that Merit Matters was a racist organization and were not happy that it opposed integration in the FDNY," other "members in the [Crown Heights] firehouse" opposed Washington's leadership because of his involvement in the Vulcan Society and derided Thomas's efforts to defend him).

---

[1] *See United States v. City of New York*, 07-CV-2067 (NGG) (RLM), 637 F. Supp. 2d 77 (E.D.N.Y. 2009). The court also found disparate treatment, but that finding was vacated on appeal. *See United States v. City of New York*, 683 F. Supp. 2d 225, 273 (E.D.N.Y. 2010), *vacated*, 717 F.3d 72 (2d Cir. 2013).

[2] *See United States v. City of New York*, 877 F. Supp. 2d 57, 58 (E.D.N.Y. 2012), *amended*, 905 F. Supp. 2d 438 (E.D.N.Y. 2012). After additional rulings and appeals, the DOJ lawsuit settled in 2014.

In response, the FDNY allegedly decided to silence Merit Matters. *See* Compl. ¶¶ 6, 46. Thus, on December 29, 2011, the FDNY issued Order 89, providing that bulletin boards "shall be used only for official Department business or important information relating to approved Departmental organizations," and that "material presenting opinions or viewpoints is not permitted anywhere in quarters," regardless of "whether such opinions or views concern Department matters or non-Department matters." *Id.* ¶ 47. This order allegedly was "issued for the purpose of silencing" Merit Matters, "which was growing at the time," and "any dissenting point of view being circulated among Firefighters about" the outcome of the DOJ lawsuit and the FDNY's response to it. *Id.* ¶ 48. According to the Complaint, the FDNY raided firehouses "to remove Merit Matters literature" and other literature opposing the district court's order. *Id.* ¶ 49. Ultimately (in 2015) the FDNY disciplined Merit Matters' leader and forced him, "though threat of termination," to disband the group and shut down its website. *Id.* ¶ 6.

The plaintiff, Thomas Buttaro, was a white firefighter in the Crown Heights firehouse and a member of Merit Matters. In mid-2011, when Merit Matters was still active, Buttaro started to wear Merit Matters and MADD t-shirts (the "shirts") around the firehouse. He was not the only firefighter to do so; at the time, the shirts were popular among certain firefighters, and no one told Buttaro not to wear them. *See id.* ¶¶ 22, 38–42.

The shirts led to three confrontations with another firefighter, Thomas, a Vulcan Society board member. *See* ALJ Op. at 3–4; Compl. ¶¶ 50–76. First, on May 6, 2012, Buttaro was wearing a MADD shirt on-duty in the firehouse and overheard Thomas say that he had not been assigned to the FDNY's special operations unit because of his race. Buttaro interjected, denying that race played a role in personnel decisions and suggesting "sarcastically" that "Thomas was not getting the assignment because he was a 'whiny c***.'" Compl. ¶¶ 50–53. Offended,

Thomas told Buttaro to remove his MADD shirt. *Id.* ¶ 54. Initially Buttaro refused, but later, at his supervisor's request, he changed into a Merit Matters shirt. *Id.* ¶ 55; *see also* ALJ Op. at 6–8.

Second, on May 16, 2012, Thomas saw Buttaro give a Merit Matters shirt to a civilian whom Buttaro had invited to the firehouse. Thomas told the civilian to remove the shirt. Buttaro objected, noting the civilian's right to wear the shirt, but the civilian followed Thomas's order. *See id.* at 9; Compl. ¶¶ 58–61.

Third, on May 21, 2012, Buttaro attended a class administered by the FDNY's Equal Employment Opportunity (EEO) office. He "intended to raise a question about whether a Firefighter had a right to object to the wearing of t-shirts." Compl. ¶ 64. But Thomas was present as an instructor "and proceeded to goad Buttaro." *Id.* ¶ 65. Thus, Buttaro objected to Thomas's presence, noting their prior conflicts and that Thomas was "goading" him. *Id.* ¶ 66. The class then continued without incident. *Id.* ¶¶ 68–69. The next morning, however, Thomas orally complained to the EEO office "about the events earlier that month," though four days later he withdrew that complaint. *Id.* ¶¶ 70, 72.

"Around this time, Washington gave an order at roll call that Merit Matters and MADD t-shirts could not be worn in the firehouse because they could cause dissension." ALJ Op. at 11. Thomas and other "black firefighters had expressed concerns about the [Merit Matters and MADD] shirts." *Id.* at 6; *see also id.* at 13. On May 30, 2012, the FDNY issued Order 37, "remind[ing]" firefighters "that only official work duty uniforms issued by the Quartermaster may be worn when on-duty." *Id.* at 12.

Buttaro nevertheless believed that he had a right to wear the shirts and continued wearing them. Compl. ¶ 74. He claims this belief was confirmed in August 2012 when an attorney from the FDNY's EEO office told another firefighter that "it was permissible to wear a non-

Department t-shirt, such as the Merit Matters or MADD t-shirts, in the firehouse while a

Firefighter was off duty." *Id.* ¶ 76.

On June 14, 2012, the FDNY issued Supplemental Order 32, which described the

department's policy against retaliation:

> [E]mployee[s] [are prohibited] from retaliating against individuals who
> have filed (or who are believed to have filed) a complaint with the Fire
> Department's EEO Office or who have participated in any way in any
> internal EEO investigation or any federal or state lawsuit or
> administrative action concerning discrimination or EEO matters. No one
> who objects to prohibited harassment, discrimination, or conduct, makes
> a good faith complaint, or assists in an investigation will be subjected to
> punishment, coercion, intimidation or retaliation. . . . Any employee
> who engages in retaliation will be disciplined.

ALJ Op. at 12.

Two weeks later, on June 28, 2012, the FDNY issued Supplemental Order 35,

which addressed the DOJ lawsuit:

> [W]hile there are many different viewpoints on the [DOJ] litigation and
> the multiple issues it presents, . . . behavior that disrupts or is likely to
> disrupt FDNY operations will not be tolerated. Nor will we condone any
> act of retaliation against anyone who is party to or part of the
> DOJ/Vulcans case, or who interacts with our EEO office. We recently
> reinforced [in Orders 37 and 89] the importance of strictly complying
> with Department rules and regulations pertaining to wearing only
> Department-issued clothing in the firehouse, and prohibiting the posting
> of anything other than Department-issued material on firehouse bulletin
> boards and walls. We will strictly enforce all of these rules and anyone
> who violates them will be subject to Departmental discipline.

*Id.* at 12–13.

Meanwhile, the DOJ lawsuit continued. After the district court's 2009 and 2010 liability

findings, in 2012, the case entered the remedy stage. The district court issued a proposed

remedial order, which included an order to implement priority hiring, and on October 1, 2012,

held a fairness hearing "so that nonparties potentially affected by the Proposed Relief Order

[including applicants and current firefighters] could voice their concerns about the proposed relief." *United States v. City of New York*, 905 F. Supp. 2d 438, 441 (E.D.N.Y. 2012).

At the hearing, Buttaro spoke in opposition to priority hiring:

> My name is Thomas Buttaro, New York City firefighter assigned to ladder company 123 in Crown Heights, also a proud member of Merit Matters.
>
> I object to proposed order for several reasons. I object to any relief being provided out to any class members who failed written exam 7029 and 2043 based on the standards set forth by the New York Civil Service Laws.
>
> The lowering of the pass mark on these open book tests to all Hispanic and Black exam takers to 25, is both impractical and unsafe. This proposed relief order, will make it impossible for a Hispanic or Black exam taker to have anything but a passing mark. An exam is a gauge of an individual's knowledge and ability. These exams are given on a grammar school reading and cognitive level. The passing mark for these exams should be set high enough to distinguish stronger candidates from weaker candidates. The exam takers who prepare for, study and apply themselves, are the same takers that increase their odds for doing well. Competition brings out the best in everyone. This competition drives one to do better, to succeed. By handing out passing marks to Black and Hispanic candidates, the open competitive test is reduced to nothing more than entitlement.
>
> Reading and comprehension are important skills that firefighters need. There are literally materials that firefighters need to train on during the career. Information is constantly changing and it is up to the 'individual firefighters to keep up on these changes.
>
> The public safety and the safety of firefighters are at stake here. To give the public and fellow firefighters anything short of the best possible candidate is dangerous for all involved, I deserve to work with nobody else, but the most qualified, regardless of race or sex. The public which we were sworn to protect deserves nothing but the best. My family, for whom I provide deserves nothing but the best. I object to any relief that is based on the belief that individuals should be judged accordingly, based on the color of their skin, not on their abilities or the content of their character. This is against the very idea upon which Civil Service was formed. . . .

Tr. of Fairness Hearing (Oct. 1, 2012), Def. Ex. C, DE 14-3, at 32–34 (paragraph breaks altered); *see also* Compl. ¶ 80.[3]

Buttaro alleges that this speech caused Thomas and Washington to retaliate against him. One week after the hearing, on October 8, 2012, Thomas photographed Buttaro wearing a MADD shirt in the firehouse. Thomas then complained to Washington, who, in turn, filed a complaint with the EEO office. Days later, the EEO office opened an investigation, informing Buttaro that he was being accused of creating a hostile work environment based on incidents involving the shirts and his interactions with Thomas. *See* Compl. ¶¶ 87–88.

While that investigation was ongoing, in May 2013, Buttaro filed his own complaint with the EEO office, accusing Thomas of retaliation based on his involvement in Merit Matters. Buttaro alleges that the FDNY "purposefully failed to address or investigate this charge." *Id.* ¶ 93. The FDNY then designated Buttaro "not in good standing," a status that deprived him of job-advancing opportunities, "including the opportunity to join a desirable position within the Fire Department's mentor program." *Id.* ¶ 94. Thomas meanwhile was promoted and transferred to a different firehouse. *Id.* ¶ 95.

Formal charges were filed a few months later, on September 19, 2013. *Id.* The FDNY accused Buttaro of "(1) creating a hostile work environment in violation of a June 14, 2012 Department Order; (2) failing to wear only Department-issued clothing in the firehouse in violation of a June 28, 2012 Department Order; (3) failing to comply with the June 14, 2012 and

---

[3] The district court rejected this objection, and the priority-hiring provision became part of the final remedial order. *See United States v. City of New York*, 905 F. Supp. 2d at 446 (citations omitted) ("These objections are based on the misconception that the court will be ordering that firefighter jobs be simply handed out to any black or Hispanic person who scored above a 25 on one of the invalid written exams. To the contrary, individuals who claim eligibility to receive priority hiring relief must fulfill all of the requirements to be a firefighter, including taking and passing Exam 2000, taking and passing the Candidate Physical Ability Test (CPAT), and meeting other lawful qualifications. Thus, none of the objections relating to priority hiring demonstrates that it unnecessarily trammels on the rights of third parties or is an unreasonable means to achieve relief for the victims.").

June 28, 2012 Department Orders; (4) failing to wear only Department-authorized clothing; (5) conduct bringing reproach or reflecting discredit on the Fire Department; and (6) violating his oath of office." *Id.*

A disciplinary hearing was held before an ALJ pursuant to New York Civil Service Law § 75. After the five-day hearing, the ALJ rejected Buttaro's First Amendment defense, sustained the charges, and recommended termination. *See* ALJ Op. at 16–20, 31–34. The ALJ based this recommendation on three findings:

1. [The FDNY] demonstrated that the potential workplace disruption outweighs [Buttaro's] First Amendment right to wear non Department-issued t-shirts in the firehouse.

2. [The FDNY] demonstrated that from May 6, 2012 until December 2012, [Buttaro] engaged in conduct meant to create a hostile work environment in violation of Department rules.

3. [The FDNY] demonstrated that [Buttaro] repeatedly failed to wear Department-issued clothing in the firehouse and repeatedly disobeyed orders to wear only authorized clothing in the firehouse in violation of Department rules.

*Id.* at 31. Buttaro did not seek review of these proceedings in New York courts.

On February 10, 2015, Commissioner Nigro adopted the ALJ's recommendation and terminated Buttaro. Compl. ¶ 97. Buttaro alleges that Nigro wanted "to make an example" of him and "to further the Fire Department's policy and practice of silencing and stifling the expression of views not favored by the Fire Department administration." *Id.* ¶ 98.

Buttaro commenced this action on October 1, 2015, asserting six causes of action: (1) retaliation in violation of the First Amendment and 42 U.S.C. § 1983; (2) selective treatment in violation of the Fourteenth Amendments and 42 U.S.C. § 1983; (3) race discrimination in violation of 42 U.S.C. § 1981; (4) conspiracy in violation of 42 U.S.C. §§ 1983 and 1985(3); (5) discrimination, retaliation, and aiding-and-abetting in violation of the New York City Human

Rights Law, N.Y.C. Admin Code §§ 8-107(6) and 8-502(c); and (6) municipal liability. Defendants have moved to dismiss the Complaint.

## 1.Analysis

### 1.1. Collateral Estoppel

Defendants argue that the ALJ's "factual determinations with respect to plaintiff's misconduct are afforded preclusive effect," and that as a result, Buttaro's discrimination, selective-enforcement, and retaliation claims are effectively precluded. Def. Mem. of Law, DE 13, ("Def. Mem.") at 11. Not quite. The ALJ decided only that Buttaro engaged in misconduct; it did not address whether the FDNY engaged in discrimination, selective enforcement, or retaliation. And while the ALJ's *factfinding* is preclusive, its legal determinations (for example, its rejection of Buttaro's First Amendment defense) are not. Therefore, although Buttaro may not dispute the finding that he engaged in the charged conduct, his claims may proceed.

"'[W]hen a state agency acting in a judicial capacity resolves issues of fact properly before it which the parties have had an adequate opportunity to litigate, federal courts must give the agency's factfinding the same preclusive effect to which it would be entitled in the State's courts.'" *Locurto v. Giuliani*, 447 F.3d 159, 170 (2d Cir. 2006) (quoting *Univ. of Tennessee v. Elliott*, 478 U.S. 788, 799 (1986)). Under New York law, collateral estoppel—or issue preclusion—applies "'when two basic conditions are met: (1) the issue sought to be precluded is identical to a material issue necessarily decided by the administrative agency in a prior proceeding; and (2) there was a full and fair opportunity to contest this issue in the administrative tribunal.'" *Schoolcraft v. City of New York*, 955 F. Supp. 2d 192, 194 (S.D.N.Y. 2013) (quoting *Jeffreys v. Griffin*, 1 N.Y.3d 34, 39 (2003)). "The burden of showing that the issues are identical and were necessarily decided in the prior action rests with the party seeking to apply issue preclusion," while "the burden of showing that the prior action did not afford a

full and fair opportunity to litigate the issues rests with the party opposing the application of

issue preclusion." *Proctor v. LeClaire*, 715 F.3d 402, 414 (2d Cir. 2013); *see also Ryan v. New

York Telephone Co.*, 62 N.Y.2d 494, 501 (1984). "Even when the requirements of collateral

estoppel are satisfied, application of the doctrine is discretionary—it is grounded on concepts of

fairness and should not be rigidly or mechanically applied." *Heller v. Bedford Cent. Sch. Dist.*,

144 F. Supp. 3d 596, 615 (S.D.N.Y. 2015) (quotation omitted).

The ALJ's finding that Buttaro engaged in the charged conduct—*e.g.*, that he "failed to

wear Department-issued clothing in the firehouse and repeatedly disobeyed orders to wear only

authorized clothing in the firehouse," ALJ Op. at 31—is entitled to preclusive effect. *See*

*Matusick v. Erie Cty. Water Auth.*, 757 F.3d 31, 49 (2d Cir. 2014) ("The *factual* findings . . . that

[the plaintiff] had indeed committed the charged conduct . . . precluded [the plaintiff] from

arguing otherwise at trial.").[4]

However, Buttaro is not precluded from arguing that Defendants engaged in retaliation,

selective enforcement, or discrimination. The ALJ explicitly declined to decide those issues. *See*

ALJ Op. at 30 ("a selective enforcement or retaliation claim is not a proper defense in an

administrative proceeding"). And by finding that Buttaro engaged in conduct warranting

termination, the ALJ did not "necessarily decide" that Defendants lacked discriminatory or

retaliatory motive. *See Matusick*, 757 F.3d at 48–49; *Dillon v. Suffolk Cty. Dep't of Health*

*Servs.*, 917 F. Supp. 2d 196, 216 (E.D.N.Y. 2013) ("[I]t is possible that the disciplinary

charges—even though upheld in administrative proceedings—would not have been brought but

---

[4] Buttaro had a full and fair opportunity to litigate his position at the administrative hearing. He was
represented by counsel and allowed to call and cross-examine witnesses, and to offer other evidence.
Although he was not allowed to conduct depositions or serve interrogatories, he has not shown that the
lack of pre-hearing discovery affected the availability of evidence or outcome of the proceedings. *See*
*Chauffeur's Training Sch., Inc. v. Spellings*, 478 F.3d 117, 132 (2d Cir. 2007); *Wickham Contracting Co.*
*v. Bd. of Educ. of City of New York*, 715 F.2d 21, 27 (2d Cir. 1983).

for the Defendants' retaliatory motive."); *Cortes v. City of New York*, 700 F. Supp. 2d 474, 486 (S.D.N.Y. 2010) ("Although defense proffers indicate that Plaintiff raised his discrimination or selective prosecution assertions at the hearings, there is no indication that the discrimination allegations were relevant to the question of whether Plaintiff had committed the charged infractions. Thus, . . . Defendants have failed to demonstrate that the allegations in this action were actually litigated and necessarily decided in the administrative proceeding."); *Morey v. Somers Cent. Sch. Dist.*, 2007 WL 867203, at *4 (S.D.N.Y. Mar. 21, 2007). Therefore, Buttaro's retaliation, selective enforcement, and discrimination claims are not precluded.

Similarly, the ALJ's finding that "potential workplace disruption outweighs [Buttaro's] First Amendment right to wear non Department-issued t-shirts in the firehouse" is a legal determination that is not entitled to preclusive effect. "[W]hether to give preclusive effect to the unreviewed legal determinations of state administrative decisions" is the subject of a circuit split on which the Second Circuit has not yet taken a position. *Doe v. Pfrommer*, 148 F.3d 73, 80 (2d Cir. 1998); *see also Leventhal v. Knapek*, 266 F.3d 64, 72 n.3 (2d Cir. 2001). Several district courts in this circuit, however, have "declined to extend preclusive effect to unreviewed agency determinations of law." *Levich v. Liberty Cent. Sch. Dist.*, 361 F. Supp. 2d 151, 161 (S.D.N.Y. 2004) ("we will not apply issue preclusion to the hearing officer's determination that plaintiff's [] letter was not protected by the First Amendment and will now consider the merits of plaintiff's retaliation claims"); *see also, e.g.*, *Pappas v. Giuliani*, 118 F. Supp. 2d 433, 442 (S.D.N.Y. 2000), *aff'd*, 290 F.3d 143 (2d Cir. 2002). These courts reason that the Supreme Court's "choice of language" in *Elliott*—the case which established that when a state agency "'resolves disputed *issues of fact* . . . federal courts must give the agency's *factfinding* the same preclusive effect to which it would be entitled in the State's courts'"—is "too specific and consistent to

ignore." *Levich*, 361 F. Supp. 2d at 161 (quoting *Elliot*, 478 U.S. at 799); *see Pappas*, 118 F. Supp. 2d at 441–42 ("The Supreme Court's specific language in *Elliott* lends further support to the conclusion that it did not wish to extend issue preclusion to unreviewed administrative determinations of law."). Moreover, interpreting *Elliott* to apply only to factfinding, not legal determinations, "comports with the fundamental purpose of § 1983 to interpose the federal courts between the States and the people, as guardians of their constitutional rights." *Levich*, 361 F. Supp. 2d at 161–62 (quotation omitted); *see Pappas*, 118 F. Supp. 2d at 442 ("if we were to hold today that the administrative determinations of law were preclusive, we would in essence be compelling [the plaintiff] to litigate his federal constitutional claims before the very agency he contends violated them"). Indeed, this approach conforms to that of New York courts. *See Akgul v. Prime Time Transp., Inc.*, 293 A.D.2d 631, 633 (2d Dep't 2002) ("[A]n administrative agency's final conclusion, characterized as an ultimate fact or a mixed question of fact and law, is not entitled to preclusive effect."). Thus, while the Court will defer to the ALJ's finding of potential workplace disruption, it will decide *de novo* whether Buttaro's activities were protected by the First Amendment.

**1.2.** Retaliation Claims

Buttaro brings a First Amendment retaliation claim, alleging that Thomas's and Washington's decisions to bring disciplinary charges and Nigro's decision to terminate him were motivated by his t-shirts and speech at the fairness hearing. *See* Compl., ¶¶ 118–121.

To state a First Amendment retaliation claim, Buttaro must plead "that: (1) his speech or conduct was protected by the First Amendment; (2) the defendant took an adverse action against him; and (3) there was a causal connection between this adverse action and the protected speech." *Matthews v. City of New York*, 779 F.3d 167, 172 (2d Cir. 2015) (quotation omitted).

A public employee's speech is protected only if the (1) the subject of the "speech was a matter of public concern," and (2) "the employee spoke 'as a citizen' rather than solely as an employee." *Id.* (quotations omitted). If both conditions are satisfied, the court must determine whether the employer was justified in restricting the speech by "balanc[ing] . . . the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of public services." *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cty.*, 391 U.S. 563, 568 (1968); *see also McCullough v. Wyandanch Union Free School District*, 187 F.3d 272 (2d. Cir. 1999).

Buttaro engaged in two kinds of speech. First, he wore Merit Matters and MADD shirts. It is essentially undisputed that Buttaro wore the shirts as a citizen rather than employee, and that this expressive speech addressed a matter of public concern. Thus, Defendants bear the burden of establishing that the FDNY's interest in avoiding discord within its ranks outweighed Buttaro's interest in free expression. *See Rankin v. McPherson*, 483 U.S. 378, 388 (1987).

To satisfy this burden, "employer need only make a reasonable determination that the employee's speech creates the potential for such harms." *Piscottano v. Murphy*, 511 F.3d 247, 271 (2d Cir. 2007); *see also Weingarten v. Bd. of Educ. of City Sch. Dist. of City of New York*, 591 F. Supp. 2d 511, 519 (S.D.N.Y. 2008) (employers need not "prov[e] harm as an empirical matter"; courts may defer to professional judgment); *Parow v. Kinnon*, 300 F. Supp. 2d 256, 266 (D. Mass. 2004) ("Courts have traditionally given greater deference to police agencies and fire departments in scrutinizing restrictions on speech than to other government employers."). Considerations include the "manner, time, and place of the employee's expression," and whether it "impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes

the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Rankin*, 483 U.S. at 388.

The FDNY's interests as an employer outweighed Buttaro's right to wear Merit Matters and MADD shirts instead of his uniform in the firehouse. The FDNY, a paramilitary organization, has a strong interest in maintaining discipline, uniformity, and harmony within its ranks. *See Janusaitis v. Middlebury Volunteer Fire Dep't*, 607 F.2d 17, 26 (2d Cir. 1979) ("When lives may be at stake in a fire, an Esprit de corps is essential to the success of the joint endeavor[,] [which] depends upon common loyalty [and] harmony among coworkers."). As highlighted by the facts of this case, the Fire Department's content-neutral uniform policy promotes these interests by avoiding the disharmony that can result when employees wear provocative clothing. *See Commc'ns Workers of Am. v. Ector Cty. Hosp. Dist.*, 467 F.3d 427, 442 (5th Cir. 2006) ("A strong argument can be made that . . . neutral uniform anti-adornment policies, administered without discrimination, applicable only to employees while on duty, will of themselves almost always pass *Pickering* balancing, as they concern what is essentially a part of the employees' normal job performance for the employer and . . . result in only the most minimal intrusion into employee free speech rights."); *Daniels v. City of Arlington, Tex.*, 246 F.3d 500, 502–503 (5th Cir. 2001) ("a police officer's uniform is not a forum for fostering public discourse or expressing one's personal beliefs"); *cf. Goldman v. Weinberger*, 475 U.S. 503, 508 (1986) (upholding against First Amendment challenge the Air Force's prohibition on yarmulkes, in light of its judgment that "traditional outfitting of personnel in standardized uniforms encourages the subordination of personal preferences and identities in favor of the overall group mission"). Therefore, Buttaro's retaliation claim based on the shirts fails as a matter of law.

The second kind of speech was Buttaro's statement at the fairness hearing. Defendants argue that Buttaro spoke as an employee rather than as a citizen and thus lacked First Amendment protection. It is helpful to begin with a brief review of the case law on the distinction between speaking as an employee and speaking as a citizen.

In the seminal case, *Garcetti v. Ceballos*, a deputy district attorney wrote a memo recommending that a prosecution be dismissed because a search warrant had been improperly obtained. 547 U.S. 410, 421 (2006). The Supreme Court held that because the deputy "did not speak as a citizen by writing a memo that addressed the proper disposition of a pending criminal case," but rather "acted as a government employee," the memo was not protected by the First Amendment. *Id.* at 422. The "controlling factor" was that the employee's "expressions were made pursuant to his duties as a [] deputy"—*i.e.* he "wrote his disposition memo because that is part of what he . . . was employed to do." *Id.* at 421.

In *Weintraub v. Bd. of Educ. of City Sch. Dist. of City of New York*, the Second Circuit affirmed a decision of this Court finding that a teacher was not protected by the First Amendment when he "fil[ed] a formal grievance with his union that challenged the school assistant principal's decision not to discipline a student who had thrown books at [the teacher] during class." 593 F.3d 196, 198 (2d Cir. 2010). The court held that the teacher's "grievance was 'pursuant to' his official duties because it was 'part-and-parcel of his concerns' about his ability to 'properly execute his duties' as a public school teacher—namely, to maintain classroom discipline, which is an indispensable prerequisite to effective teaching." *Id.* at 203 (citation omitted). In other words, the teacher's speech "was a 'means to fulfill, and 'undertaken in the course of performing,' his primary employment responsibility of teaching." *Id.* (citation omitted).

In *Lane v. Franks*, the director of a "statewide program for underprivileged youth" discovered that a state representative on the program's payroll had not been reporting to work. 134 S. Ct. 2369, 2375 (2014). The director fired the representative, who was later indicted on charges of mail fraud and theft concerning a program receiving federal funds. *Id.* The director testified before the grand jury and at the criminal trial "about his reasons for firing the representative." *Id.* The Supreme Court held that this testimony was "speech as a citizen." *Id.* at 2378. The Court stressed that "the critical question under *Garcetti* is whether the speech at issue is *itself* ordinarily within the scope of an employee's duties, *not* whether it merely concerns those duties." *Id.* at 2379 (emphasis added). Thus, although the director's duties included hiring and firing employees and managing the program's finances (*id.* at 2375), his "[s]worn testimony in judicial proceedings" *about* his decision to fire an employee for stealing from the program was "outside the scope of his ordinary job duties" and therefore "speech as a citizen for First Amendment purposes." *Id.* at 2378–79.

In *Matthews v. City of New York*, the Second Circuit held that an NYPD officer's oral complaints to his supervisors about "a quota system mandating the number of arrests, summons, and stop-and-frisks that police officers must conduct" were made as a citizen. 779 F.3d 167, 169 (2d Cir. 2015). The court stressed that the officer's "speech addressed a precinct-wide policy" and that "such policy-oriented speech was neither part of his job description nor part of the practical reality of his everyday work," holding that the officer spoke as a citizen because his "actual, functional job responsibilities did not include reporting his opinions on precinct-wide quota systems to Precinct commanders." *Id.*

Defendants argue that by "express[ing] concern that the proposed changes [to the FDNY's hiring practices" were 'both impractical and unsafe'" Buttaro's statement "focused on

[his] ability to perform his job as a firefighter, which falls squarely under *Weintraub*'s 'part-and-parcel standard." Def. Mem. at 16. But Defendants read *Weintraub* too broadly, particularly in light of *Lane*'s holding that "the critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, *not whether it merely concerns those duties*." 134 S. Ct. at 2379 (emphasis added). It is undisputed that Buttaro's "actual, functional job responsibilities" (*Matthews* 779 F.3d at 169) did not include commenting on the FDNY's hiring policies or the proposed remedy in the DOJ lawsuit. Accordingly, the Complaint adequately alleges that Buttaro spoke as a citizen.[5]

Defendants concede that Buttaro's statement addressed a matter of public concern (see Def. Mem. at 18) and do not argue that under *Pickering* the City's interests as an employer outweighed Buttaro's right to make the statement. Thus, Buttaro's statement at the fairness hearing was a protected activity for purposes of his retaliation claim.

Defendants argue that the Complaint does not allege a causal connection between that activity and an adverse employment action. Bringing disciplinary charges, designating an employee "not in good standing," and terminating an employee are adverse actions, as the threat of such actions could dissuade a reasonable employee from engaging in protected activity. And the Complaint adequately pleads causation. The FDNY began investigating Buttaro just days after he spoke at the hearing. When Buttaro responded that the complaints against him were retaliatory, the FDNY ignored him. Other employees who wore unauthorized shirts and derided their colleagues were not charged or terminated, though the FDNY disciplined another vocal

---

[5] Defendants also argue that Buttaro's statement at the fairness hearing "lacks any civilian analogue . . . because notice of the Fairness Hearing was restricted to claimants, unions, and incumbent FDNY employees." Def. Mem. at 17. But "the lack of a citizen analogue is 'not dispositive.'" *Weintraub*, 593 F.3d at 204 (quoting *Garcetti* 547 U.S. at 424); *cf. Matthews*, 779 F.3d at 176 (emphasis added) (noting that "the channel [the plaintiff] chose to address his concerns about the quota system [] *reinforces* our conclusion that [he] spoke as a citizen").

leader of Merit Matters and forced him to disband the group and shut down its website. While the Complaint is thinly pled, its allegations of temporal proximity, disparate treatment, and retaliatory motive, considered together, are sufficient to make the claim of retaliation plausible.

Thus, the Court must consider whether the individual defendants may be held liable for the retaliation. Thomas, for one, cannot be held individually liable because at the time of the alleged retaliation, he was Buttaro's co-worker, not a supervisor, and there is no allegation that he exercised control over Buttaro. *See Kohutka v. Town of Hempstead*, 994 F. Supp. 2d 305, 317 (E.D.N.Y.), *reconsideration denied,* 2 F. Supp. 3d 378 (E.D.N.Y. 2014) ("Section 1983 claims against individuals in their personal capacity pursuant to 42 U.S.C. § 1983 ordinarily require that the defendant be a supervisor or have some position of authority or control over the plaintiff. Otherwise, it is difficult to establish that the abusive action was perpetrated 'under color of state law' rather than as an essentially private act. Where the individual defendant is merely a co-worker of the plaintiff, such claims are routinely dismissed for failure to state a claim."). Accordingly, the claims against Thomas are dismissed.

Washington and Nigro, on the other hand, were supervisors, and therefore may be held liable in their individual capacities if they were "personally involved in the alleged constitutional deprivation." *Rivera v. Fischer*, 655 F. Supp. 2d 235, 237–38 (W.D.N.Y. 2009). Personal involvement can be pled by "alleging facts showing that: (1) the defendant participated directly in the alleged constitutional violation; (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong; (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom; (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or (5) the defendant exhibited deliberated indifference to others'

rights by failing to act on information." *Id.* The Complaint alleges that Washington directly participated in the filing of disciplinary charges, and that Nigro (who became Commissioner in 2014, after the charges but before the termination) continued his predecessor's policy against Merit Matters and other expressions of dissent. As support, he alleges that under Nigro's leadership, the FDNY forced the leader of Merit Matters to close the group and its website. Moreover, it is plausible that Nigro was aware that Buttaro complained of retaliation and selective enforcement during the termination proceedings, and failed to investigate those claims. Therefore, the claims against Nigro and Washington may proceed.[6]

In sum, the retaliation claim based on the shirts is dismissed. The retaliation claim based on the statement at the fairness hearing may proceed against Washington and Nigro, but not against Thomas.

### 1.3. Selective Enforcement Claim

Buttaro asserts a claim against Nigro and the City under the Equal Protection Clause of the Fourteenth Amendment. He alleges that prior to 2012, the Fire Department "did not strictly enforce uniform regulations, and Firefighters regularly wore t-shirts in the firehouse bearing political, social, or other images and messages" without consequence. Compl. ¶¶ 106, 124, 126. The conditions were such that someone from the FDNY's EEO office apparently believed it was permissible to wear MADD and Merit Matters t-shirts in the firehouse while "off duty." *Id.* ¶ 76. Buttaro alleges that only he was disciplined for violating uniform regulations or related orders.

---

[6] Defendants' argument that Washington and Nigro are protected by qualified immunity is largely conclusory. To the extent Defendants make specific and relevant arguments, the Court rejects them. It was clearly established that Buttaro's statement was made as a citizen and therefore protected from retaliation (Defendants concede that the statement addressed a matter of public concern and that *Pickering* balancing favors the speech). *See Ricciuti v. Gyzenis*, 2016 WL 4446016, at *5 (2d Cir. Aug. 24, 2016) ("*Garcetti* and pre-*Garcetti* case law . . . clearly established that [an employee] could not be fired simply because her speech owed its existence to her employment."). It was also clearly established that bringing retaliatory disciplinary charges and effecting a retaliatory discharge constitute adverse employment actions. Thus, at this stage, the Court cannot conclude that Washington and Nigro are protected by qualified immunity.

Although Buttaro labels this a "selective prosecution and termination" claim, it is best construed as a viewpoint discrimination claim, as the crux of the Complaint is that the FDNY "t[ook] sides in the debate" among firefighters. *Id.* ¶ 8. "Government action that suppresses protected speech in a discriminatory manner may violate both the First Amendment and the Equal Protection Clause." *Dariano v. Morgan Hill Unified Sch. Dist.*, 767 F.3d 764, 779–80 (9th Cir. 2014).[7] So construed, the viewpoint discrimination claim is not duplicative of the retaliation claim. While the *Pickering* balancing discussed above may justify the FDNY's decision to bar firefighters from wearing expressive t-shirts in lieu of department-authorized clothing, it does not justify enforcing that policy in a way that favors one controversial or potentially disruptive viewpoint over another.[8]

Nevertheless, the Complaint fails adequately to allege viewpoint discrimination. Although it alleges that firefighters "regularly wore t-shirts in the firehouse bearing political, social, or other images and messages," it does not provide specific examples or suggest that

---

[7] As discussed below in the context of Buttaro's § 1981 claim, the notion that Buttaro was targeted because of his *race* is not supported by factual allegations. Therefore, to the extent his equal protection claim is based on race, it is dismissed.

[8] Defendants argue that the "Second Circuit has held that where a selective enforcement claim is found to 'coalesce' with a legally insufficient First Amendment retaliation claim, the Equal Protection claim must also fail as a matter of law. *Heusser v. Hale*, 777 F. Supp. 2d 366, 385 (D. Conn. 2011). In those cases, however, the First Amendment retaliation claims failed because the plaintiff failed to prove causation or because the speech was not made as a citizen on a matter of public concern. *See id.* at 382 (punished speech did not address an issue of public concern); *Sweeney v. Leone*, 2006 WL 2246372, at *11 (D. Conn. July 31, 2006) (speech made in official capacity and not on a matter of public concern); *Airday v. City of New York*, 131 F. Supp. 3d 174, 182 (S.D.N.Y. 2015) (same); *Cobb v. Pozzi*, 363 F.3d 89, 107 (2d Cir. 2004) (retaliation claim failed for lack of causation); *Mental Disability Law Clinic v. Hogan*, 853 F. Supp. 2d 307, 315 (E.D.N.Y. 2012), *aff'd* 519 F. App'x 714 (2d Cir. 2013) (same); *Clayton v. City of Middletown*, 564 F. Supp. 2d 105, 114 (D. Conn. 2008) (same); *Levesque v. Town of Vernon*, 341 F. Supp. 2d 126, 137 (D. Conn. 2004) (same); *Mental Disability Law Clinic, Touro Law Ctr. v. Hogan*, 519 F. App'x 714, 717 (2d Cir. 2013) (same); *see also African Trade & Info. Ctr., Inc. v. Abromaitis*, 294 F.3d 355, 361 (2d Cir. 2002) (holding that "a bidder or applicant for a new government contract who lacked a preexisting commercial relationship with the government" did not have "a clearly established right not to be denied the contract in retaliation for his or her protected speech"). In this case, in contrast, Buttaro spoke as a citizen on a matter of public concern.

these messages presented the same potential for workplace disruption that Merit Matters and MADD t-shirts did. Nor does the Complaint allege that the FDNY did anything to promote the Vulcan Society's message over Merit Matter's message. Therefore, the Complaint fails to state an equal protection or viewpoint discrimination claim.

Plaintiff requests leave to amend the Complaint. Because that amendment would not necessarily be futile, the request for leave to amend the equal protection claim is granted.

**1.4.** Discrimination Claims

Buttaro brings an employment discrimination claim under 42 U.S.C. § 1981, alleging he was discriminated and retaliated against because of his race. *See* Compl. ¶ 129. This claim is not supported by specific allegations in the Complaint, which focuses on actions taken against Buttaro because of his speech, not race. Therefore, the discrimination claim is dismissed.

**1.5.** Conspiracy Claims

Buttaro's conspiracy claims are barred by the intracorporate conspiracy doctrine—the "officers, agents, and employees of a single corporate entity are legally incapable of conspiring together." *Shakur v. Graham*, 2015 WL 1968492, at *16 (N.D.N.Y. May 1, 2015) (quoting *Nassau Cnty. Employee "L" v. Cnty. of Nassau*, 345 F. Supp. 2d 293, 304 (E.D.N.Y. 2004)). Although the doctrine originated in cases involving corporations, courts have applied it to public entities. *See, e.g.*, *Silverman v. City of New York*, 2001 WL 1776157, at *4 (E.D.N.Y. Nov. 19, 2001); *Huntemann v. City of Yonkers*, 1997 WL 527880, at *14 (S.D.N.Y. Aug. 25, 1997). "The Second Circuit has recognized the intracorporate conspiracy doctrine in the context of § 1985," and "several district courts in this circuit have applied the doctrine to bar § 1983 conspiracy claims." *Ali v. Connick*, 136 F. Supp. 3d 270, 282 (E.D.N.Y. 2015) (citations omitted).

Buttaro invokes the "personal interest" exception to the intracorporate conspiracy doctrine, which applies when "a plaintiff adequately alleges that each defendant possessed an

independent, personal conspiratorial purpose." *Quinn v. Nassau County Police Dep't*, 53 F.Supp.2d 347, 360 (E.D.N.Y. 1999). Buttaro argues that Thomas and Washington were motivated by "their own personal stake in the Vulcan Society's position" in the DOJ lawsuit. Pl. Mem. of Law, DE 20, at 30. But Buttaro does not allege that Thomas and Washington's actions were intended to further, or had the effect of furthering, the Vulcan Society's litigation interests. And mere "[p]ersonal bias is not considered a personal interest and is not within the exception." *Shakur v. Graham*, 2015 WL 1968492, at *16 (N.D.N.Y. May 1, 2015). Thus, the personal interest exception does not apply, and Buttaro's conspiracy claims are dismissed.

**1.6.** Municipal Liability Claims

The factual allegations discussed above are sufficient to support the allegation that "the actions taken against [Buttaro] were taken because of a policy and practice within the Fire Department to silence the views and speech of individuals" associated with Merit Matters. Compl. ¶ 140. Accordingly, the motion to dismiss claims against the City is denied.


Conclusion

Defendants' motion to dismiss is GRANTED in part and DENIED in part. The t-shirt-based retaliation claim, equal protection claim, discrimination claims, conspiracy claims, and claims against Thomas are dismissed. The retaliation claim based on the fairness hearing statement and municipal liability claim survive.

Plaintiff's request for leave to file an amended complaint is GRANTED only with respect to the equal protection claim; it is otherwise DENIED. The amended complaint, if any, must be filed within 15 days of the date of this order.

SO ORDERED.

Dated:     Brooklyn, New York
           September 15, 2016

_____/s/_____
I. Leo Glasser